UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                              Case No. 11-64190

MATTHEW MICHAEL MEHLHOSE,                           Chapter 13
and
ERIN HANSON HARDCASTLE-MEHLHOSE,                    Judge  Thomas J. Tucker

                        Debtors.
_____/

## OPINION REGARDING MOTION BY CREDITOR
## THE J.L. GISLASON, III, TRUST
## TO DISMISS, FOR FILING BAR, AND FOR SANCTIONS

For the reasons stated in this opinion, the Court concludes that the Debtors in this

bankruptcy case, Michael Mehlhose and Erin Hardcastle-Mehlhose, each filed this case in bad

faith, lied under oath about their income in their Schedule I, and have abused the bankruptcy

system.  Because this cannot be tolerated, the Court will dismiss this case for cause, bar Debtors

from filing any new bankruptcy case for two years, and require Debtors to pay the attorney fees

and expenses of the creditor who moved to dismiss this case.

This Chapter 13 case is before the Court on a motion by creditor J.L. Gislason, II, Trust

u/a/d February 3, 2001 (the "Trust"), entitled "Motion to Dismiss, For Filing Bar, and For

Appropriate Sanctions" (Docket # 13, the "Motion").  The Court held two hearings on the

Motion, including an evidentiary hearing held on February 13, 2012.  For the reasons stated in

this opinion, the Court will grant the Motion in its entirety.

### I.  Procedural history and facts

This is the third bankruptcy case that Debtors have filed since August 2009.[1]  The

_____

[1]  In addition to the three joint cases that Debtors have filed, Debtor Matthew M. Mehlhose filed
a voluntary Chapter 7 case on February 15, 2001, Case No. 01-42673.  He received a discharge in that

following is a brief summary of the relevant events in the Debtors' three bankruptcy cases.

## A. Debtors' first bankruptcy case (Case No. 09-65691)

Debtors filed the first bankruptcy case (Case No. 09-65691) on August 19, 2009, through attorney Robert J. McClellan, under Chapter 7.[2]  On Schedule F, Debtors listed the Trust as a judgment creditor with a claim of $1.00.[3]  This filing was shortly after the Trust obtained a default judgment against Debtors in the Livingston County, Michigan Circuit Court, for $106,970.40  (the "Livingston County Default Judgment").[4]

The Trust filed an adversary proceeding against Debtors, seeking (1) the denial of Debtors' discharge under 11 U.S.C. §§ 727(a)(2)(A) and 727(a)(4); and (2) a determination that a judgment debt owed to the Trust was nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6).[5]  After Debtors failed to timely respond to the adversary proceeding in any way, the Court entered a default judgment against Debtors on December 16, 2009 (the "Default Judgment").[6]  The Default Judgment stated, in relevant part:

> IT IS ORDERED that Default Judgment is entered in favor of the Plaintiff, against the Defendants, Erin Hardcastle and Matthew Mehlhose.

---

case on May 18, 2001, and the case was closed on January 28, 2002.

[2]  Docket # 1 in Case No. 09-65691.

[3]  *Id.* at pdf. p. 17.

[4]  *See* Docket # 1 in Adv. Pro. No. 09-6907 at pdf. p. 9.  A copy of this state court default judgment was admitted into evidence at the evidentiary hearing, as Creditor's Exhibit 5.  Exhibits from that hearing are cited in this opinion as CX-__ for the Trust's exhibits, and DX-A for the Debtors' exhibit (only one of which was admitted, Exhibit A).

[5]  Docket # 1 in Adv. Pro. No. 09-6907.

[6]  Docket # 8 in Adv. Pro. No. 09-6907; CX-7.

2

> IT IS FURTHER ORDERED that pursuant to 11 U.S.C.
> §§523(a)(2)(A), 523(a)(4), and 523(a)(6), the Defendants'
> indebtedness in the amount of $106,500.00, pursuant to a
> Judgment in Livingston County Circuit Court, in a case captioned
> J.L. Gislason III, Trust U/A/D 2/3/2001 v Erin Hardcastle, et al.,
> Case #09-24337-CZ to the Plaintiff is excepted from discharge.
>
> IT IS FURTHER ORDERED that pursuant to 11 U.S.C.
> §§727(a)(2)(A) and 727(a)(4) the Defendants' discharge is denied.[7]

On December 21, 2009, acting without an attorney, Debtors filed a motion for relief from the Default Judgment (the "First Reconsideration Motion"), which, in relevant part, made the following allegations regarding why Debtors had not timely answered the complaint:

> 1. Defendants were attempting to retain their Bankruptcy
>    attorney to represent them [in] this Adversary Proceeding
>    but were unable to do so.
>
> 2. Defendants had obtained an application for Pro Bono
>    counsel and were in the process of completing and
>    submitting it to the Court at the time that the answer time
>    expired.[8]

On January 8, 2010, the Court entered an order denying the First Reconsideration Motion.[9]

On February 4, 2010, again acting without an attorney, Debtors filed a second motion for relief from the Default Judgment (the "Second Reconsideration Motion").[10] In this motion, the Debtors made allegations that were inconsistent with the allegations they made in the First Reconsideration Motion. The Second Reconsideration Motion alleged, in pertinent part:

---

[7] *Id.*

[8] Docket # 9 in Adv. Pro. No. 09-6907.

[9] Docket # 14 in Adv. Pro. No. 09-6907; CX-8.

[10] Docket # 16 in Adv. Pro. No. 09-6907. Only Debtor Erin Hardcastle signed the Second Reconsideration Motion, but that motion was filed in the name of both of the Debtors.

3

1.     Defendants had an agreement with their Bankruptcy attorney that he would file an appearance for the Advers[ary] Proceedings to allow for time to answer. The Bankruptcy attorney failed to file that motion and purposely allowed the deadline to lapse. The Bankruptcy attorney's actions were a breach of contract with Defendants and breach of professional duty to act in a manner in clients' best interests. Attorney committed professional malpractice and fraud by representing to clients that a response would be filed or had been filed with the Court then failing to do so. . . .

2.     Defendants had to repeatedly request the application for Pro Bono counsel over a three week period and did not receive it from the Bankruptcy attorney until the time of the answer had lapsed without allowing an opportunity to prepare and submit an answer to the Court prior to the expiration of the deadline.[11]

On February 22, 2010, the Court denied the Second Reconsideration Motion, noting that the First Reconsideration Motion did not allege that "[Debtors'] bankruptcy attorney had agreed to file an appearance and a motion to extend the answer deadline in this adversary proceeding." The Court noted that "[i]f anything, [the First Reconsideration Motion] contradicts this allegation," because it alleged only that "Defendants were attempting to retain their Bankruptcy attorney to represent them [in] this Adversary Proceeding but were unable to do so."[12]

Debtors' first bankruptcy case was closed on March 5, 2010, with no discharge.

## B.  Debtors' second bankruptcy case (Case No. 10-46231)

On February 28, 2010, six days after the Court denied the Second Reconsideration Motion and before their first bankruptcy case was closed, Debtors filed a new bankruptcy case,

---

[11]  *Id.*

[12]  Docket # 21 in Adv. Pro. No. 09-6907 ("Amended Order Denying Defendants' *Second* Motion to Reopen, Etc.") at 2.

4

this time under Chapter 13, Case No. 10-46231.[13]  For this case, Debtors had a new attorney,

Brian Rookard.  On Schedule F, Debtors listed the Trust as a creditor, with a claim of

$107,000.00 based on a 2009 judgment.[14]

The Trust also filed an adversary proceeding in Debtors' second bankruptcy case.  The

adversary complaint noted that the Trust  had obtained a default judgment in Debtors' prior

bankruptcy case denying Debtors a discharge, and holding that Debtors' debt to it was

nondischargeable.[15]  The complaint sought, in relevant part, a declaratory judgment that Debtors'

debt to the Creditor Trust was nondischargeable in this Chapter 13 bankruptcy case.[16]  Before any

determination was made in the adversary proceeding, however, Debtors' second bankruptcy case

was dismissed.  The case was dismissed before confirmation of a Chapter 13 plan, because of

Debtors' "failure to comply with the terms and conditions set forth in the Order Adjourning the

Confirmation hearing entered on . . . 7/2[3]/10 by failing to be 100% current [in required plan

payments] on Trustee records by 9/23/10."[17]  Debtors had only a 67.6% pay history at the time of

dismissal on September 27, 2010.[18]

## C.  Debtors' third (and current) bankruptcy case (Case No. 11-64190)

---

[13]  Docket # 1 in Case No. 10-46231; CX-21.

[14]  *Id.* at pdf. p. 20.

[15]  *See* Docket # 1 in Adv. Pro. No. 10-5797 at ¶¶ 48-51, 56-58.

[16]  *Id.* at 7.

[17]  *See* "Order Dismissing Case" (Docket # 103) in Case No. 10-46231.  The July 23, 2010 Order adjourning the confirmation hearing (Docket # 84) was the second adjournment of the confirmation hearing.  The first adjournment occurred on May 21, 2010, on a stipulation between Debtors and the Chapter 13 Trustee (*see* Docket # 44).

[18]  *Id.*

After Debtors' second bankruptcy case was dismissed, Debtors returned to state court. They sought and obtained relief from the Livingston County Default Judgment. The state court vacated the default judgment in 2010.[19] The Trust then sought to invoke an arbitration clause in the construction contract which was the subject of its claim against the Debtors. On July 8, 2011, the state court entered a stipulated order requiring the Trust and the Debtors to engage in binding arbitration of the Trust's claims.[20] Debtors' stipulation to this arbitration order was signed by Debtors' attorney, Robert W. Lee. Among other things, the state court order required each party to pay one half of the initial deposit required by the American Arbitration Association. The Trust paid the entire $975.00 deposit and Debtors refused to reimburse the Trust for their half of the deposit. And the Debtors failed to cooperate in scheduling an arbitration hearing and picking an arbitrator. Instead, the Debtors filed their third bankruptcy case.

On September 13, 2011, through attorney Robert W. Lee, Debtors filed the current bankruptcy case, their third bankruptcy case, this time under Chapter 7 (Case No. 11-64190).[21] On Schedule F, Debtors listed the Trust as a judgment creditor with a claim incurred in 2009, listing the amount of the claim as "Unknown."[22]

Debtors' Schedule I, filed with the petition, stated that Debtor Matthew Mehlhose's average monthly income was $3,336.00, and that Debtor Erin Hardcastle-Mehlhose's average

---

[19] Debtors' Response to Mot. to Dismiss (Docket # 17) at ¶¶ 2, 10-11, 13; Trust's Brief (Docket # 47) at 3.

[20] CX-12.

[21] Docket # 1 in Case No. 11-64190.

[22] *Id.* at pdf. p. 25.

monthly income was $975.00, for a combined average monthly income of $4,311.00.[23]  Debtors'

Schedule J, also filed with the petition, states that Debtors have average monthly expenses of

$4,303.00, leaving Debtors with a net monthly income of $8.00.[24]

**D.  Proceedings in this case after the Trust filed its motion to dismiss**

On October 10, 2011, the Trust filed the present Motion.[25]  The Motion alleges, in part:

> 9.     As noted on the schedules, almost all of the listed debts
>         were incurred prior to the Debtors' 2009 bankruptcy filing.
>
> 10.    This case appears to have been filed without any valid
>        bankruptcy purpose as almost all of the debts listed in the
>        Debtors' [bankruptcy schedules] would be excluded from
>        discharge pursuant to 11 U.S.C. § 523(a)(10).
>
> 11.    Upon information and belief, this case was inappropriately
>        filed, not for a fresh start, but for the purpose of frustrating
>        collection efforts of the listed creditors.[26]

The Motion sought dismissal of this bankruptcy case, a 180-day bar to refiling any new

bankruptcy case under any chapter of the Bankruptcy Code, and attorney fees and costs.

In Debtors' response to the Motion, filed by their attorney Mr. Lee on October 31, 2011,

Debtors stated that in 2010, the Livingston County Circuit Court set aside the Livingston County

Default Judgment, and that the Trust's claim was still being litigated when Debtors filed this

bankruptcy case.[27]  Debtors further stated that "[i]f [they] had prevailed against the [Trust] in

---

[23]  *Id.* at pdf. p. 35.

[24]  *Id.* at pdf. p. 36.

[25]  Docket # 13 in Case No. 11-64190.

[26]  *Id.* at 2; *see also* Pl.'s Supplemental Br. in Supp. of Mot. to Dismiss (Docket # 47 in Case No. 11-64190) at 3.

[27]  Debtor's Response to Mot. to Dismiss (Docket # 17 in Case No. 11-64190) at ¶¶ 2, 10-11, 13.

7

state court in 2009, the [Trust] would not have had standing to bring an adversarial complaint in [Debtors' first bankruptcy case, which resulted in the Default Judgment.][28] Also on October 31, 2011, Debtors filed a document through their attorney Mr. Lee, entitled "Request for Hearing," in which Debtors requested a hearing on the Motion, and alleged, in relevant part, that: "The Debtors can not afford to file Chapter 13."[29]

The Court scheduled a hearing on the Motion for November 16, 2011.[30] On November 10, 2011, attorney Kevin F. Carr became new counsel of record for Debtors, replacing Robert W. Lee, and Debtors then filed a motion to convert their Chapter 7 case to Chapter 13.[31] On November 16, 2011, Debtors filed an amended motion to convert (the "Conversion Motion"),[32] and the hearing on the Motion was adjourned. No one objected to the Conversion Motion, and on December 13, 2011, the Court entered an order converting Debtors' Chapter 7 case to Chapter 13.[33]

On December 20, 2011, Debtors filed, among other things, amended Schedules I and J.[34] Debtors' amended Schedule I states that Debtor Matthew Mehlhose's average monthly income is

---

[28] *Id.*

[29] Docket # 19 at 1 ¶ 2.

[30] Docket # 20.

[31] Docket # 24 ("Notice of Substitution of Attorney"); Docket # 25.

[32] Docket # 28. It appears that the only difference between the two conversion motions is that the first one included a 14-day notice, while the second one included a 21-day notice. (A 21-day notice is required for such a motion.)

[33] Docket # 31.

[34] Docket # 37.

$3,092.57, and that Debtor Erin Hardcastle-Mehlhose's average monthly income is $3,257.13, for a combined average monthly income of $6,349.70.[35] Debtors' amended Schedule J states that Debtors have average monthly expenses of $4,237.33, leaving Debtors with a net monthly income of $2,112.37.[36]

On December 22, 2011, Debtors filed a proposed Chapter 13 plan.[37] In their Plan, Debtors propose to make bi-weekly payments of $977.25 to the Chapter 13 Trustee for 60 months, and to pay to the Trustee 100% of all tax refunds they receive, or are entitled to receive, after the commencement of their case.[38] The Plan proposes a minimum dividend to general unsecured creditors of 12%.

The Court held an initial hearing on the Motion on January 5, 2012, and then held an evidentiary hearing on February 13, 2012. This opinion states the Court's findings of fact and conclusions of law regarding the Motion.

## II. Jurisdiction

This Court has subject matter jurisdiction over this bankruptcy case and this contested matter under 28 U.S.C. §§ 1334(b), 157(a) and 157 (b)(1), and Local Rule 83.50(a) (E.D. Mich.). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

## III. Discussion

### A. Debtors' dishonesty, bad faith, and abuse of the bankruptcy system

---

[35] *Id.* at pdf. p. 6.

[36] *Id.* at pdf. p. 7.

[37] Docket # 41 in Case No. 11-64190.

[38] *Id.* at 1 ¶¶ I.A-I.C.

9

**1. The Debtors filed a Chapter 7 case that could not serve any legitimate purpose.**

Debtors' current counsel concedes that there was no legitimate bankruptcy-related purpose for Debtors to have filed this case under Chapter 7, rather than Chapter 13. This is because all or virtually all of Debtors' debts, including their debt to the Trust, cannot be discharged in a Chapter 7 case. Debtors admit that all or virtually all of their debts arose before they filed their 2009 Chapter 7 case, and they were denied a discharge in that case under 11 U.S.C. §§ 727(a)(2) and 727(a)(4). As a result, 11 U.S.C. § 523(a)(10) excepts those debts from discharge in any Chapter 7 case filed after the 2009 case.[39]

Section 523(a)(10)'s exception to discharge does not apply to a discharge in a Chapter 13 case, under 11 U.S.C. § 1328(a). No doubt this is why Debtors filed their 2010 case under Chapter 13 rather than Chapter 7. (As noted above, that Chapter 13 case failed because Debtors did not make their required plan payments.)

It made no sense for Debtors to have filed this case under Chapter 7, *unless* they did so only to hinder and delay the Trust and possibly other creditors, by temporarily obtaining the benefit of the automatic stay under 11 U.S.C. § 362(a). That, of course, would be an improper purpose, and would constitute a bad faith filing and an abuse of the bankruptcy system.

---

[39] Section 523(a)(10) states, in pertinent part:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> (10) that was or could have been listed or scheduled by the debtor in a prior case concerning the debtor under this title or under the Bankruptcy Act in which the debtor waived discharge, or was denied a discharge under section 727(a)(2), (3), (4), (5), (6), or (7) of this title, . . . .

11 U.S.C. § 523(a)(10).

Debtors did not testify at, or even attend, the evidentiary hearing. Nor did their former attorney in this case, Robert W. Lee, testify or appear. Debtors' current attorney was unable to give the Court any reason why Debtors (through attorney Lee) filed this case as a Chapter 7 case, rather than as a Chapter 13 case. He obviously has had access to his clients, the Debtors, to ask them why they did this. And he acknowledged that he has talked to the former attorney Mr. Lee. But Debtors counsel has offered no explanation, and no rational, good faith reason, why Debtors filed this case under Chapter 7.

Nor is it possible for the Court to speculate that, perhaps, Debtors filed this case under Chapter 7, even though they could not get a discharge of their debts, because they wanted a Chapter 7 trustee to liquidate the Debtors' non-exempt assets, for the benefit of the creditors. First, Debtors have not alleged that this was their motivation. Second, there is no evidence that this was any part of the Debtors' motivation or thinking in filing under Chapter 7. Third, the Debtors' schedules filed with their petition, specifically Schedules A through D, list no non-exempt assets having any equity.[40] Rather, this was a "no asset" Chapter 7 case, according to Debtors' schedules, in which creditors could not hope to receive any distribution. Fourth, the day after the Chapter 7 trustee concluded the first meeting of creditors, he filed a report of no distribution, stating that "there is no property available for distribution from the estate over and above that exempted by law."[41]

The Debtors' filing this case under Chapter 7, rather than under Chapter 13, clearly was a

---

[40] Docket # 1 in Case No. 11-64190 at pdf. pp. 8-14.

[41] This no-distribution report appears on the Court's docket, and is dated November 4, 2011.

waste of time, and it caused undue and unnecessary delay of at least three months.[42]  It also

caused the Trust to incur unnecessary expense in filing a motion to dismiss what was then a

senseless Chapter 7 case.

**2.  The Debtors each lied under oath about their income in their Schedule I.**

There is a further and equally troubling problem with the Debtors' conduct in this case.

The evidence presented at the evidentiary hearing shows that when the Debtors filed this case

under Chapter 7, they both understated their income, by a substantial amount.  Under penalty of

perjury, the Debtors each certified the accuracy of the Schedule I that they filed on September 13,

2011.  That Schedule I was materially false, however, and the Court finds that the Debtors must

have known, and in fact did know, that it was false when they certified and filed it.

The Court has compared the Debtors' Schedule I with the Debtors' paystubs that were

admitted in evidence.  Debtors' Schedule I stated that Debtors had the following average gross

monthly income, and average net monthly income ("net monthly income" as used here meaning

gross monthly income less payroll deductions):[43]

|  | gross monthly income: | net monthly income: |
|---|---|---|
| Debtor Matthew Mehlhose: | $4,023.00 | $3,336.00 |
| Debtor Erin Hardcastle Mehlhose: | $1,189.00 | $975.00 |
| Total: | $5,212.00 | $4,311.00 |

[42]  Debtors filed this case under Chapter 7 on September 13, 2011, and did not move to convert the case to Chapter 13 until November 10, 2011.  The case languished in Chapter 7 for three months, from the September 13, 2011 petition date until conversion was ordered on December 13, 2011.

[43]  These numbers are taken from Lines 1, 15, and 16 of Debtors' Schedule I filed September 13, 2011 (Docket # 1 at pdf. p. 35).  Another copy of this Schedule I is Creditor's Exhibit 14, admitted into evidence at the evidentiary hearing.

Each of the Debtors declared under penalty of perjury that they had read their schedules, including Schedule I, and that they "are true and correct to the best of my knowledge, information, and belief."[44]

Debtors' Schedule J listed their average monthly expenses, which totaled $4,303.00, which when subtracted from the Debtors' net monthly income from Schedule I of $4,311.00, left a monthly disposable income of only $8.00.[45]

The Debtors' paystubs show that when they filed this case each of the Debtors had significantly higher income, both gross and net after payroll deductions, than the amounts Debtors swore to in their Schedule I.

Debtor Matthew Mehlhose was paid on a weekly basis. His paystubs show that he had the following income for the 10 weeks ending on September 4, 2011:[46]

| week ending: | gross pay for the week: | net pay for the week: |
|---|---|---|
| 06/26/11 | $576.00 | $508.63 |
| 07/03/11 | $936.00 | $782.44 |
| 07/10/11 | $855.00 | $721.68 |
| 07/17/11 | $1,179.00 | $964.68 |
| 07/24/11 | $1,044.00 | $863.43 |
| 07/31/11 | $1,179.00 | $964.68 |
| 08/14/11 | $1,219.50 | $995.07 |
| 08/21/11 | $1,057.50 | $873.56 |
| 08/28/11 | $1,098.00 | $903.93 |
| 09/04/11 | $1,017.00 | $843.19 |

---

[44] Docket # 1 at pdf. p. 39.

[45] Schedule J at lines 18, 20c (Docket # 1 at pdf. p. 36; CX-14).

[46] These numbers are taken from the paystubs at CX-23. There was a slight delay between the end of each pay period and the date on which Matthew was paid by his employer. For example, for the week ending September 4, 2011, Matthew was paid on September 9, 2011. That was Matthew's last pay date before this bankruptcy case was filed, on September 13, 2011.

13

From these numbers, the Court calculates that the average of Matthew Mehlhose's gross and net income, over the last 4, 7, and 10 weeks before he filed this bankruptcy case, were as follows:[47]

|  | gross per week: | = gross per month: | net per week: | = net per month: |
|---|---|---|---|---|
| average for the last 10 weeks: | $1,016.10 | $4,399.71 | $842.13 | $3,646.42 |
| average for the last 7 weeks: | $1,113.43 | $4,821.15 | $915.51 | $3,964.14 |
| average for the last 4 weeks: | $1,098.00 | **$4,754.34** | $903.94 | **$3,914.05** |

From these numbers, it is clear that Matthew Mehlhose's gross and net income was understated in his Schedule I. Schedule I stated that Matthew had a gross monthly income of $4,023.00 and a net monthly income of $3,336.00. But if we use the average of the last 4 weeks before he filed his petition and Schedule I, Matthew actually had a gross monthly income of $4,754.34 and a net monthly income of $3,914.05. (If we use the average of the last 7 weeks pre-petition, Matthew's income numbers would be even higher.) Thus, Matthew's Schedule I income was materially understated.

The understatement of Debtor Erin Hardcastle-Mehlhose's income in Schedule I is substantially greater than Matthew's understatement. Debtors' Schedule I, which was filed with the Chapter 7 petition on September 13, 2011, said that Erin was employed as a Building

---

[47] In this table, and later in this opinion, the Court translates weekly income to monthly income by multiplying the weekly income by 4.33 (52 weeks per year ÷ 12 months = 4.33 weeks per month, on average).

Inspector for the Township of Harrison, Michigan, and had been so employed for two weeks.[48]

As noted above, Schedule I listed Erin's average gross monthly income from her employment as

$1,189.00, and her average net monthly income ("net monthly income" as used here meaning

gross monthly income less payroll deductions) as $975.00.

Erin was paid on a bi-weekly basis (*i.e.*, every two weeks). Her paystub for the two

weeks ending September 7, 2011 shows that she had bi-weekly gross pay of $1,783.44 and bi-

weekly net pay (after withholding for taxes) of $1,379.65.[49] This bi-weekly pay equates to gross

**monthly** income of $3,861.15 (versus $1,189.00 on Schedule I), and net **monthly** income of

$2,986.94 (versus $975.00 on Schedule I). Based on these pre-petition monthly income

numbers, the Court finds that Erin's gross and net monthly income was substantially understated

on her Schedule I. In fact, her ***actual*** income (both gross and net) was ***more than three times***

what she stated it was in her Schedule I.

If Matthew and Erin had accurately stated the amounts of their average gross and net

income in their Schedule I, the key numbers as of the petition date would have been as

summarized in the following table:

| | Schedule I/J as filed: | **Should have been:** |
|---|---|---|
| Debtor Matthew Mehlhose: | | |

---

[48] CX-14 at 1.

[49] These numbers are from the paystub at CX-25. As was the case with Matthew, Erin's paystubs show that there was a slight delay between the end of each pay period and the date on which Erin was paid by Harrison Township. For the bi-weekly period ending September 7, 2011, Erin was paid on September 14, 2011. (CX-25). This was Erin's last pay period before this bankruptcy case was filed, on September 13, 2011.

|  | Schedule I/J as filed: | **Should have been:** |
|---|---|---|
| gross monthly income:[50] | $4,023.00 | $4,754.34 |
| net monthly income:[51] | $3,336.00 | $3,914.05 |
| Debtor Erin Hardcastle Mehlhose: |  |  |
| gross monthly income: | $1,189.00 | $3,861.15 |
| net monthly income: | $975.00 | $2,986.94 |
| Debtors' total net monthly income:[52] | $4,311.00 | **$6,848.09** |
| Debtors' total average monthly expenses (per Schedule J):[53] | $4,303.00 | $4,303.00 |
| Debtors' monthly disposable income:[54] | $8.00 | **$2,545.09** |

Thus, if Debtors' had *accurately* disclosed their income in the Schedule I that they filed with their Chapter 7 petition, their Schedules I and J would have shown that they *did* have the ability to fund a Chapter 13 plan that would result in substantial distributions to creditors. *Accurate* Schedules I and J would have shown that Debtors had the ability to pay $2,545.09 per month into a Chapter 13 plan (not just $8.00 per month as shown by the Schedules I and J they filed,) *plus* the $963.00 per month and $300.00 per month listed in the expenses in their Schedule J for their first and second mortgage payments, respectively.[55]

---

[50] Schedule I, line 3.

[51] Schedule I, line 15.

[52] Schedule I, line 16.

[53] Schedule J, lines 18 and 20b.

[54] Schedule J, line 20c (labeled "Monthly net income").

[55] These monthly mortgage payments are listed as expenses in Debtors' Schedule J, at lines 1 and 13b.

16

When Debtors' first attorney, Mr. Lee, responded to the Trust's motion to dismiss on October 31, 2011, in part, by saying that "[t]he Debtors can not afford to file a Chapter 13,"[56] this could appear to be a plausible statement, based on the fact that Debtors' Schedules I and J showed a monthly disposable income of only $8.00. The accurate but undisclosed numbers just discussed, however, show that this $8.00 per month number was way off the mark, and that the Debtors certainly *could* afford to file and pursue a Chapter 13 case when they instead filed Chapter 7.

When Debtors finally obtained new counsel and filed their motion to convert to Chapter 13, on November 16, 2011, two months after filing Chapter 7, they did not immediately amend their inaccurate Schedule I. They did not do that for another month, when they filed amended Schedules I and J on December 20, 2011.[57] Those amended schedules showed slightly lower income for Matthew, but substantially higher income for Erin, than did Debtors' original Schedules I and J. The following table compares the two sets of numbers:

| | original Schedule I/J: | amended Schedule I/J: |
|---|---|---|
| Debtor Matthew Mehlhose: | | |
| gross monthly income: | $4,023.00 | $3,744.00 |
| net monthly income: | $3,336.00 | $3,092.57 |
| Debtor Erin Hardcastle Mehlhose: | | |
| gross monthly income: | $1,189.00 | $4,293.47 |
| net monthly income: | $975.00 | $3,257.13 |

---

[56] Docket # 19 at 1 ¶ 2.

[57] These amended schedules are at Docket # 37, and a copy of them was admitted into evidence as CX-17.

|  | original Schedule I/J: | amended Schedule I/J: |
|---|---|---|
| Debtors' total net monthly income: | $4,311.00 | **$6,349.70** |
| Debtors' total average monthly expenses (per Schedule J): | $4,303.00 | $4,237.33 |
| Debtors' monthly disposable income:[58] | $8.00 | **$2,112.37** |

Thus, the Debtors' December 20, 2011 amended Schedules I and J confirmed that Debtors in fact could afford to fund a Chapter 13 plan (something Debtors had expressly denied, through their attorney Mr. Lee, as recently as October 31, 2011). This was further admitted by Debtors, of course, when they filed their Chapter 13 plan on December 22, 2011.[59]

But as discussed above, the evidence shows that Debtors could afford to file and pursue a Chapter 13 case all along, from the day they filed this case under Chapter 7 forward. This was not a new development that only happened due to a post-petition increase in Debtors' income. Debtors' post-petition paystubs show that their income did not appreciably change between the time they filed their Chapter 7 petition, and the time they converted to Chapter 13 and filed their amended schedules and Chapter 13 plan.[60]

3. **The Debtors had a chance to try to explain their actions, at the evidentiary hearing, but they chose not to do so.**

Neither of the Debtors testified, or even appeared, at the evidentiary hearing in this case. Nor did their original attorney, Robert W. Lee, appear or testify. No evidence or explanation has been offered or proven by Debtors, of any of the following:

---

[58] Schedule J, line 20c (labeled "Monthly net income").

[59] Docket # 41.

[60] This is shown by Debtors' post-petition paystubs, CX-22, 23, and 26.

18

1.  Why did Debtors file this case under Chapter 7, when, as their current attorney admits,

   a Chapter 7 case made no sense, because:

   - the Debtors could not hope to obtain a discharge of their debts in Chapter 7;

   - a Chapter 7 case could not help any of the creditors;

   - a Chapter 7 case could only delay and hinder the creditors because of the automatic stay.

2.  Why did Debtors' original Schedule I significantly understate their income?

Debtors have never argued, for example, that they did what they did because of advice they received from their original attorney, Mr. Lee. At the evidentiary hearing, Debtors' current attorney could offer no explanation or answer to the questions. That is very telling, because Debtors' current attorney admits, and it is obvious, that he has had access to the Debtors (his clients). And he admits that he has spoken to Debtors' original attorney, Mr. Lee. Yet, Debtors did not testify; nor did Debtors bring Mr. Lee in to testify (by subpoena if necessary). And Debtors did not even attend the evidentiary hearing, possibly to shield themselves from being questioned by the Trust's attorney, or by the Court.

Under the circumstances, and on the evidence presented, the Court must conclude that the Debtors filed this bankruptcy case, and then tried for over a month to keep the case pending in, Chapter 7:

   - in bad faith;

   - for no legitimate purpose;

   - simply to use the automatic stay under 11 U.S.C. § 362(a) to hinder and delay a large and pressing creditor, the Trust;

and that the Debtors knowingly made materially false statements regarding their income in their

original Schedule I, and failed to correct those false statements for more than three months.

The Debtors' basic defense against the Motion, as argued by their current attorney, is this: that the Debtors have fixed everything by getting a new attorney, converting to Chapter 13, filing amended Schedules I and J, and filing a feasible and reasonable Chapter 13 plan. Even if all that is true, none of it is sufficient under the circumstances. The Court cannot allow Debtors to file a case in bad faith and for an improper purpose, knowingly file false schedules, and abuse the bankruptcy system, all with impunity, simply because when the Debtors were caught, they then tried to come clean. It simply won't do.

In addition, the Court notes that this is not the first time these Debtors have been dishonest with this Court in a bankruptcy case. As described in Part I-A of this opinion, the Debtors lied to this Court during their 2009 Chapter 7 case (Case No. 09-65691) when they told inconsistent stories in twice seeking reconsideration of the default judgment denying them a discharge, in Adversary Proceeding No. 09-6907.

These Debtors have abused the bankruptcy system, and the Court cannot tolerate it. There is cause to dismiss this bankruptcy case under 11 U.S.C. § 1307(c), and the Court will dismiss the case. The Court will also order the additional relief described in the later sections of this opinion.

## B. "Cause" to dismiss this bankruptcy case

Under § 1307(c) of the Bankruptcy Code, the Court may dismiss a debtor's Chapter 13 bankruptcy case "for cause." It provides:

> (c) Except as provided in subsection (f) of this section, **on request of a party in interest** or the United States trustee **and after notice and a hearing, the court may** convert a case under this chapter to

20

a case under chapter 7 of this title, or may **dismiss a case under this chapter**, whichever is in the best interests of creditors and the estate, for cause, including--

>   (1) **unreasonable delay by the debtor that is prejudicial to creditors**;

>   (2) nonpayment of any fees and charges required under chapter 123 of title 28;

>   (3) failure to file a plan timely under section 1321 of this title;

>   (4) failure to commence making timely payments under section 1326 of this title;

>   (5) denial of confirmation of a plan under section 1325 of this title and denial of a request made for additional time for filing another plan or a modification of a plan;

>   (6) material default by the debtor with respect to a term of a confirmed plan;

>   (7) revocation of the order of confirmation under section 1330 of this title, and denial of confirmation of a modified plan under section 1329 of this title;

>   (8) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan other than completion of payments under the plan;

>   (9) only on request of the United States trustee, failure of the debtor to file, within fifteen days, or such additional time as the court may allow, after the filing of the petition commencing such case, the information required by paragraph (1) of section 521(a);

>   (10) only on request of the United States trustee, failure to timely file the information required by paragraph (2) of section 521(a); or

> (11) failure of the debtor to pay any domestic
> support obligation that first becomes payable after
> the date of the filing of the petition.

(emphasis added).

Certainly, there is cause to dismiss this case because the Debtors are guilty of "unreasonable delay . . . prejudicial to creditors," within the meaning of § 1307(c)(1). In addition, the statute's list of 11 examples of what constitutes cause to dismiss a case is not exclusive. *See Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 373 (2007). The filing of a bankruptcy case in bad faith also is considered "cause" to dismiss a case under § 1307(c). *Alt v. United States* (*In re Alt*), 305 F.3d 413, 418–19 (6th Cir.2002)("[T]here is abundant authority for the notion that a bankruptcy court has the power to dismiss a Chapter 13 petition upon a finding that the debtor did not bring it in good faith.").

The Sixth Circuit has "announced standards for bankruptcy courts to follow in determining the debtor's good faith." *Alt*, 305 F.3d at 419 (italics omitted). A determination of "good faith is a fact-specific and flexible determination" which "requires consideration of the totality of circumstances." *Copper v. Copper* (*In re Copper*), 426 F.3d 810, 815 (6th Cir. 2005)(citations omitted). "Under the totality of the circumstances test, [courts] analyze both the prior conduct of the bankruptcy petitioner and the petitioner's present circumstances." *Society Nat'l Bank v. Barrett* (*In re Barrett*), 964 F.2d 588, 590 (6th Cir. 1992).

The *Alt* court also noted that "[i]n considering whether a petition has been brought in good faith, other circuits have recognized factors similar to those relevant in determining whether

a plan has been proposed in good faith." *Alt,* 305 F.3d at 419.[61]  The Sixth Circuit listed twelve

"circumstances to be considered in determining whether a plan has been proposed in good faith":

(1) the debtor's income;

(2) the debtor's living expenses;

(3) the debtor's attorney's fees;

(4) the expected duration of the Chapter 13 plan;

(5) the sincerity with which the debtor has petitioned for relief under Chapter 13;

(6) the debtor's potential for future earning;

(7) any special circumstances, such as unusually high medical expenses;

(8) the frequency with which the debtor has sought relief before in bankruptcy;

(9) the circumstances under which the debt was incurred;

(10) the amount of payment offered by debtor as indicative of the debtor's sincerity to repay the debt;

---

[61]  The *Alt* court cited with approval the Seventh Circuit case of *In re Love*, 957 F.2d 1350 (7th Cir. 1992), as one example of a circuit court decision that took this approach, explaining that

in *Love*, the Seventh Circuit adopted a "totality of the circumstances" test for determining whether a Chapter 13 petition was filed in good faith and set forth a "nonexhaustive" list of factors, which include "the nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7 proceeding; the timing of the petition; how the debt arose; **the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors**."

*Id.* (citing *Love*, 957 F.2d at 1357)(emphasis added).

(11) the burden which administration would place on the trustee;

(12) the statutorily-mandated policy that bankruptcy provisions be construed liberally in favor of the debtor.

305 F.3d at 419 (citing *Society Nat'l Bank v. Barrett* (*In re Barrett*), 964 F.2d 588, 592 (6th Cir. 1992)).

In considering such a list of factors, however, the Court must keep in mind that:

no list is exhaustive of all the conceivable factors which could be relevant when analyzing a particular debtor's good faith. It would be impossible to provide such a list and we have not attempted to do so. We also stress that no one factor should be viewed as being a dispositive indication of the debtor's good faith. We agree with the Fifth Circuit that "[t]he 'totality of the circumstances' test means what it says: It exacts an examination of all the facts in order to determine the bona fides of the debtor."

*Hardin v. Caldwell* (*In re Caldwell*), 851 F.2d 852, 860 (6th Cir. 1988)(citing *In re Chaffin*, 816 F.2d 1070, 1074 (5th Cir. 1987).

Considering the totality of circumstances in this case, and for the reasons detailed in Part III-A of this opinion, the Court has concluded that the Debtors filed this case in bad faith. So the Court will dismiss the case for cause under § 1307(c). Because they filed this case in bad faith, the Debtors are "atypical litigant[s] who ha[ve] demonstrated that [they are] not entitled to the relief available to the typical debtor." *See Marrama*, 549 U.S. at 111 & n.11 (citation and footnote omitted). Debtors are not "members of the class of honest but unfortunate debtor[s] that the bankruptcy laws were enacted to protect." *See id.*

## C. Monetary sanctions

This Court has both inherent authority, and statutory authority under 11 U.S.C. § 105(a), to sanction Debtors for their misconduct in this case, namely (1) filing this case under Chapter 7

24

in bad faith; (2) knowingly and under penalty of perjury filing a false Schedule I, in which they materially understated their income, and (3) persisting in holding to their false statement of income for some time during bankruptcy proceedings, all with the design of falsely making it appear that they could not afford to fund a Chapter 13 plan, delaying the creditors' collection efforts, and thwarting the judicial process. *See, e.g., John Richards Homes Bldg. Co., L.L.C. v. Adell* (*In re John Richards Homes Bldg. Co.*, *L.L.C.*), 404 B.R. 220, 227 (E.D. Mich. 2009)(citation omitted)("[i]n addition to the inherent authority to issue sanctions as explained in *Chambers* [*v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)], 11 U.S.C. § 105(a) grants to federal bankruptcy courts the authority to issue sanctions" and "bankruptcy courts have both an inherent and a statutory power to issue sanctions . . . [which] can be applied to all instances of 'conduct which abuses the judicial process,' including conduct which occurred in other courts"). "The consideration of sanctions is a core proceeding arising in a case under title 11, as described by 28 U.S.C. § 157, as it is inextricably intertwined with the bankruptcy case itself, which is undoubtedly a core proceeding." *John Richards Homes Bldg. Co., L.L.C. v. Adell* (*In re John Richards Homes Bldg. Co.*, *L.L.C.*), 404 B.R. 220, 225 (E.D. Mich. 2009).

**1. The bankruptcy court's inherent authority to sanction misconduct**

In *John Richards Homes Bldg. Co., L.L.C. v. Adell* (*In re John Richards Homes Bldg. Co.*, *L.L.C.*), 404 B.R. 220, 226-27 (E.D. Mich. 2009), the court discussed the scope of a bankruptcy court's inherent power to issue sanctions as follows:

> Bankruptcy courts, like all courts, have an inherent power to issue sanctions, as explained by the United States Supreme Court in the *Chambers* case. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) ("Courts of justice are universally acknowledged to be vested, by their very creation, with

25

power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates.") (quoting *Anderson v. Dunn*, 19 U.S. 204, 6 Wheat. 204, 227, 5 L.Ed. 242 (1821)). The Sixth Circuit Court of Appeals has similarly stated that "[b]ankruptcy courts, like Article III courts, enjoy inherent power to sanction parties for improper conduct." *Mapother & Mapother, P.S.C. v. Cooper* (*In re Downs*), 103 F.3d 472, 477 (6th Cir.1996). . . . [T]he inherent power to issue sanctions is not limited to only those instances where a party violates a court order. "The federal courts' inherent power to protect the orderly administration of justice and to maintain the authority and dignity of the court extends to a full range of litigation abuses." *Mitan v. Int'l Fid. Ins. Co.*, 23 Fed.Appx. 292, 298 (6th Cir.2001) (ruling that a court can award sanctions "when bad faith occurs").

The United States Court of Appeals for the Ninth Circuit likewise recognized a

bankruptcy court's inherent authority to issue sanctions for misconduct:

> A bankruptcy court's inherent power allows it to sanction "bad faith" or "willful misconduct," even in the absence of express statutory authority to do so. It also "allows a bankruptcy court to deter and provide compensation for a broad range of improper litigation tactics."
>
> The inherent sanction authority differs from the statutory civil contempt authority in at least two ways. First, with the inherent power, a bankruptcy court may sanction a "broad range" of conduct, unlike the "[c]ivil contempt authority[, which only] allows a court to remedy a violation of a specific order (including 'automatic' orders, such as the automatic stay or discharge injunction)." Second, unlike the civil contempt authority, "[b]efore imposing sanctions under its inherent sanctioning authority, a court must make an explicit finding of bad faith or willful misconduct." "[B]ad faith or willful misconduct consists of something more egregious than mere negligence or recklessness."
>
> "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44, 111 S.Ct. 2123.

*Price v. Lehtinen* (*In re Lehtinen*), 564 F.3d 1052, 1058-59 (9th Cir. 2009)(citations omitted).

Federal courts, including bankruptcy courts, have the discretion to award attorney fees and expenses as a sanction for misconduct under their inherent authority. The United States Supreme Court, in *Chambers v. NASCO, Inc.*, explained the circumstance under which a federal court may award attorney fees as a sanction:

> [A] court may assess attorney's fees when a party has "'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" In this regard, if a court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled," it may assess attorney's fees against the responsible party, as it may when a party "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order[.]" The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of "vindicat[ing] judicial authority without resort to the more drastic sanctions available for contempt of court and mak[ing] the prevailing party whole for expenses caused by his opponent's obstinacy."

> We discern no basis for holding that the sanctioning scheme of the statute and the rules displaces the inherent power to impose sanctions for the bad-faith conduct described above. These other mechanisms, taken alone or together, are not substitutes for the inherent power, for that power is both broader and narrower than other means of imposing sanctions. First, whereas each of the other mechanisms reaches only certain individuals or conduct, the inherent power extends to a full range of litigation abuses. At the very least, the inherent power must continue to exist to fill in the interstices.

501 U.S. 32, 45-46 (1991)(citations and footnote omitted); *see also Knowles Bldg. Co. v. Zinni*, (*In re Zinni*), 261 B.R. 196, 203 (B.A.P. 6th Cir. 2001)(citation omitted)("It should also be noted that federal courts, including the bankruptcy court, have the inherent power to impose sanctions on a scope broader than that of Bankruptcy Rule 9011, including monetary sanctions."); *Miller v. Cardinale* (*In re DeVille*), 361 F.3d 539, 551, 553 (9th Cir. 2004)(affirming the decision of the

Bankruptcy Appellate Panel for the Ninth Circuit, which affirmed a bankruptcy court's award of all reasonable attorney fees and costs as a sanction under the bankruptcy court's inherent authority); *Schwartz v. Kujawa (In re Kujawa)*, 256 B.R. 598, 610 (B.A.P. 8th Cir. 2000), *aff'd in part, rev'd in part, on other grounds,* 270 F.3d 578 (8th Cir. 2001)(acknowledging a bankruptcy court's inherent authority to award attorney fees as a sanction for misconduct "despite the existence of procedural rules which sanction the same conduct," and stating that "such rules, such as Rule 11, are not substitutes for the inherent power").

### 2. The bankruptcy court's statutory power under 11 U.S.C. § 105(a) to sanction misconduct

In addition to a bankruptcy court's inherent authority to sanction misconduct, 11 U.S.C. § 105(a) provides a bankruptcy court with statutory authority to do so. It provides:

> (a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

A bankruptcy court's statutory equitable authority under § 105(a) is "broad." *In re Dow Corning Corp.*, 280 F.3d 648, 656 (6th Cir. 2002). It exceeds the equitable authority available under "traditional equity jurisprudence." *Id.* at 658. However, such power is not limitless and must not be exercised in a way that is inconsistent with the Bankruptcy Code. *Id.*; *see also Gold v. Winget (In re NM Holdings Co., LLC)*, 407 B.R. 232, 273 (Bankr. E.D. Mich. 2009). There is nothing in the language of § 1307(c) of the Bankruptcy Code, which prevents a bankruptcy court from sanctioning a debtor, upon dismissal of the debtor's bankruptcy case for cause, for misconduct

28

occurring during the pendency of the case. *See Marrama v. Citzens Bank of Massachusetts*, 549 U.S. 365, 374-75 (2007)("Nothing in the text of either § 706 or § 1307(c) (or the legislative history of either provision) limits the authority of the court to take appropriate action in response to fraudulent conduct by the atypical litigant who has demonstrated that he is not entitled to the relief available to the typical debtor.")

Section 105(a) provides bankruptcy courts with authority to award attorney fees as a sanction for misconduct. *See, e.g., Greenbelt v. Richard Potasky Jeweler, Inc.* (*In re Richard Potasky Jeweler, Inc.*), 222 B.R. 816, 829 (S.D. Ohio 1998)(citations omitted)("a bankruptcy court may award attorney fees to a corporate debtor pursuant to § 105(a), even though the court would be unable to accomplish the same task under § 362(h)" and "every court that has considered the issue has found that § 105(a) provides the bankruptcy court with the power to award attorney's fees as a means of enforcing the automatic stay"); *In re Dental Profile Inc.*, 446 B.R. 885, 906-07 (Bankr. N.D. Ill. 2011)("[W]here a party unreasonably prolongs litigation, it is within the court's [§ 105(a)] authority to require that party to pay attorneys' fees."); *Grochocinski v. Spehar Capital, LLC* (*In re CMGT, Inc.*), 458 B.R. 473, 492 (Bankr. N.D. Ill. 2011)(internal quotation marks and citation omitted)("Sanctions are justified under § 105(a) where the sanctioning court has clearly found that a litigant intentionally abused the judicial process in an unreasonable and vexatious manner. Where a party unreasonably prolongs litigation, it is within the court's inherent equitable authority to require that party to pay attorneys' fees.")

In this case, the Debtors' bad faith and abuse of the bankruptcy system have caused the Trust to incur attorney fees and expenses, in filing and prosecuting the Trust's motion to dismiss. The Court will require Debtors to pay the Trust such attorney fees and expenses incurred by the

Trust, to the extent they are reasonable in amount.

## D. Barring Debtors from filing any new bankruptcy case for two years

In its Motion, the Trust initially requested that in addition to dismissing this case, the Court bar the Debtors from filing any new bankruptcy case for 180 days. At the evidentiary hearing, the Trust modified that request, to ask for a two-year bar to refiling. The Court has the discretion to order a two-year bar to refiling. Based on the findings and conclusions stated in Part III-A of this opinion, the Court finds that a two-year bar to refiling is necessary and appropriate under the circumstances.

"Where there is sufficient cause, bankruptcy courts have the authority pursuant to 11 U.S.C. §§ 105(a)[62] and 349(a)[63] to prohibit bankruptcy filings in excess of 180 days." *Cusano v.*

_____

[62] Section 105(a) provides:

> (a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

[63] Section 349(a) provides:

> (a) **Unless the court, for cause, orders otherwise**, the dismissal of a case under this title does not bar the discharge, in a later case under this title, of debts that were dischargeable in the case dismissed; nor does the dismissal of a case under this title prejudice the debtor with regard to the filing of a subsequent petition under this title, except as provided in section 109(g) of this title.

11 U.S.C. § 349(a)(emphasis added).

*Klein* (*In re Cusano*), 431 B.R. 726, 737 (B.A.P. 6th Cir. 2010)(citations omitted)(reasoning that "[s]ection 109(g) is not . . . a limitation on the bankruptcy court's authority to impose sanctions fashioned to prevent abuse of the bankruptcy system" and finding that "[t]he record . . . demonstrate[d] sufficient cause to prohibit th[e] [d]ebtor from refiling for Chapter 13 protection for two years"); *see also Dietrich v. Nob-Hill Stadium Properties,* No. 05-2255, 2007 WL 579547, at *5 (6th Cir. Feb. 15, 2007)(unpublished)(footnote omitted)("We conclude that the plain language of section 349(a) appears to allow a bankruptcy court to dismiss a bankruptcy petition with prejudice, permanently, if there is sufficient cause. That result is consistent with the decisions of most courts outside of the Tenth Circuit which have addressed the issue."); *Mains v. Foley*, Nos. 1:11-CV-456, 1:11-CV-740, 2012 WL 612006, at * 7 (W.D. Mich. Feb. 24, 2012)(agreeing with *Cusano* that a bankruptcy court has authority to bar debtors from refiling for bankruptcy for a period of more than 180 days where there is sufficient cause, and citing cases imposing bars of more than 180 days); *Javens v. Ruskin*, No. 99-74189, 2000 WL 1279189, at *2 (E.D. Mich. Aug. 24, 2000)(following "the majority of the circuits and the case law" in concluding "that the Bankruptcy Court had the authority to bar future filings in excess of 180 days" where the bankruptcy court had barred the debtor from filing another bankruptcy case for 18 months), *aff'd* 23 Fed. Appx. 456 (6th Cir. 2001); *but see Frieouf v. United States* (*In re Frieouf*), 938 F.2d 1099, 1104 (10th Cir. 1991)("[interpreting section 349(a) and section 109(g) to allow bankruptcy courts to prohibit future filings for a period greater than 180 days, not only contradicts the statute's plain meaning, but encroaches on the fifth amendment's due process and equal protection guarantees").

    A bankruptcy court's finding of bad faith, or an abuse of the bankruptcy process,

particularly in the case of serial filers, is generally considered sufficient cause to impose a bar to refiling for more than 180 days. *See In re Morris*, No. 3:10-BK-04143, 2010 WL 3943927, at *9 (Bankr. M.D. Tenn. Oct. 6, 2010)("One of the causes justifying dismissal of a case with prejudice for longer than 180 days is a case filed in bad faith by a serial filer."); *see also Cusano*, 431 B.R. at 737 (finding sufficient case for the bankruptcy court to impose a 2-year bar where the debtor had "filed three Chapter 13 petitions in three years" to impede creditors from collecting on their judgment, and the bankruptcy court had make a finding of bad faith on the part of the debtor); *Javens*, 2000 WL 1279189, at *2 (affirming the bankruptcy court's 18-month bar where the bankruptcy court found, among other findings, that the numerous actions by the debtor in his numerous filings to be "'blatant indicia of bad faith" and an "abuse of the bankruptcy system"); *In re Robertson*, 206 B.R. 826, 830-31 (Bankr. E.D. Va. 1996)(holding that a bankruptcy court has discretion to determine the duration of a bar to refiling; and finding that a bar of 417 days was appropriate where there was "strong evidence of bad faith on the part of the debtor," who had filed "three Chapter 13 bankruptcy petitions in violation of § 1325(a)(3)"); *In re Price*, 304 B.R. 769, 773 (Bankr. N.D. Ohio 2004)(360-day bar was appropriate due to the debtors' "tag-team approach to obtaining bankruptcy relief" which was an "abuse of the bankruptcy system").

## IV. Conclusion

For the reasons stated in this opinion, the Court will grant the Trust's Motion, and will enter an order: (1) dismissing this case for cause; (2) sanctioning Debtors by requiring them to pay the Trust's reasonable attorney fees and expenses incurred in filing and prosecuting its Motion; and (3) barring the Debtors from filing another bankruptcy case for two years.

**Signed on March 22, 2012**                     /s/ Thomas J. Tucker

                                                 **Thomas J. Tucker**
                                                 **United States Bankruptcy Judge**